A. W. LOHR, Appellant, v. MATHEW R. FABER et al., Appellees.

**CORPORATIONS:** Subscription to Stock—Fraud. Evidence in an action to recover of the officers of a corporation the amount paid for stock, on the ground of the fraudulent conduct of said officers, reviewed, and held insufficient to sustain a recovery.

*Appeal from Plymouth District Court.*—WILLIAM HUTCHINSON, Judge.

SEPTEMBER 26, 1922.

The plaintiff, in his own right and as assignee of others, brings this action in equity, to recover the amount of money paid by them for shares of stock in certain corporations, of which the defendants are alleged to have been officers and promoters, and by whose alleged wrongful acts and representations, plaintiff and his assignors were induced to make such investments. By order of the court, the issues were tried before C. W. Pitts, as referee, who, upon hearing the evidence, found for the defendants, that plaintiff had failed to sustain the allegations of his petition, and that the action should be dismissed upon its merits. The referee's report was confirmed and approved by the trial court, and the plaintiff's bill was accordingly dismissed. The plaintiff appeals.—*Affirmed.*

*Klay & Klay* and *T. E. Diamond,* for appellant.

*T. M. Zink, Kass Bros. & Sievers, Saunders & Stuart, Frank E. Northrop, John M. Galvin, Carl C. Cowles,* and *Kimball, Peterson & Smith,* for appellees.

WEAVER, J.—The record submitted to this court, filling something more than a thousand printed pages, is entirely too long and complicated to permit its detailed statement within the reasonable limits of this opinion. Realizing this evident fact, the appellant adopts the referee's report as an embodiment of the "statement of facts" required by our rules in the framing of his brief, and we shall confine our attention to the case as thus made. The report fills over 130 printed pages of the record, and contains, not only the substance of the evidence offered by the parties, but 137 separate findings of fact. Abbreviating, so far as practicable, the showing thus made, it discloses a situation substantially as follows:

Before the opening of the recent war in Europe, the commercial supply of potash in this country was very largely obtained from importations from Germany. The interruption of this trade, occasioned by the war, led to activity in the development of our sources of domestic supply of the material. Among other ventures in this line was the manufacture or production of potash from the waters of certain small lakes in Nebraska. For that purpose, a corporation styled the National Potash Company was organized in November, 1917, to take over a certain lease or leases theretofore acquired by one O'Brien, of what are known as the "Beck Lakes," and to erect the necessary works for the utilization of these waters. The shares of stock in this corporation do not appear to have been offered to general subscription, but to have been issued to the promoters, in payment for the leases acquired and moneys advanced for the establishment of the plant. Later, the same promoters organized another corporation, known as the United States Potash Company, to lease and utilize certain other lakes in that vicinity. This was followed by still another corporation, called the Antioch Potash Company, to lease and utilize still other lakes. All these several corporations were organized and officered by the same persons; and at varying dates, the other persons named among the parties plaintiff and defendants acquired one or more shares of stock therein. In the organization of the Antioch Company, it was at first planned, among other things, to give each of the stockholders in the original corporation the option to sell stock in the new company to twice the amount of their holdings in the old

company, and receive in return twice such amount in fully paid nonassessable common stock of the Antioch. A circular stating the terms of this scheme was sent to all the holders of the National Potash Company's stock. It seems, however, that, before the proposition was accepted or acted upon, doubts had arisen as to its legality, and it was abandoned. At least, there is no showing that any of the so-called "bonus stock" was ever issued. About this time, the rose-colored prospects of great profits in these enterprises began to fade, and the interlocking interests of the corporations were the source of increasing embarrassment. Fire had destroyed the plant constructed by the National Company, the demand for potash decreased, and indebtedness was accumulating. It was found or believed to be desirable that the three companies, the "National," the "United States," and the "Antioch," be consolidated or merged, and to that end there was created the "National Potash Corporation." The board of directors of this last corporation was then authorized to take assignments from the three companies already named, of all their assets of every nature and kind, in consideration of the assumption of all their corporate indebtedness by the new corporation, which would also issue its own stock to an amount equal to the shares held by the stockholders of the companies so absorbed. The plaintiff herein became the owner of shares in the Antioch Company in July, 1918. At or about the time of his acquisition of the stock, he personally visited and examined the property and place of business at Antioch, and satisfied himself of the value and desirability of his purchase, and thereafter took interest in inducing others to purchase other shares. He consented to the merger or consolidation of the company into the newly organized National Potash Corporation, and received and accepted the stock of the absorbing company in lieu of the shares held by him in the Antioch Company. He attended the meetings of the National Potash Corporation, and served upon one of its committees to obtain a settlement of some of its business differences with another party. Eventually, however, the National Corporation found it impossible to liquidate its business and meet the demands of its creditors, and in August, 1919, was adjudged bankrupt. In January, 1920, this action was begun, and finally tried, with the result already stated.

The referee's findings are very full and specific, and we are satisfied that they are well supported by the evidence. Reduced to brief and simple terms, the report finds that there is no sufficient evidence to sustain the charge of fraud or conspiracy to defraud by the defendants or any of them, and that the loss sustained by the plaintiff and his assignors is in no manner chargeable to any actionable wrong on defendants' part. The simple truth seems to be that the exceptional conditions brought about by the war and the extraordinary advance in the commercial value of potash and the apparent prospect of producing it at an immense profit gave rise to a speculative craze, which found expression in this effort to coin riches out of the bitter waters of the alkaline lakes of Nebraska. The enterprise, by which a real need was to be met, was entirely commendable, and might well attract the interest of honest and intelligent men. It appeared to be feasible, and to promise a tempting reward to those willing to risk the time and money to finance it. There is nothing to impeach the good faith of the promoters, or to suggest that they engaged in it as a fraudulent scheme by which to get something for nothing, or to take advantage of the ignorance or weakness of others. In short, there was nothing in the venture itself which was inherently wrong or vicious, and as there is no claim of right to recover as upon contract, the burden is upon the plaintiff to allege and prove that he has in some manner suffered loss or damage by the tort of the defendants. In argument to this court, counsel for appellant lays principal stress on the conceded fact that, in organizing the Antioch Company, it was originally planned to give the stockholders in the National Company a certain proportion of so-called "bonus stock," thus creating an unlawful discrimination or preference for the benefit of some stockholders over others. This plan, if in fact consummated, the referee properly ruled would have been illegal, but since it was not carried out, and since there was no preference or discrimination shown, the fact that it was at first contemplated, but later abandoned, will not support a recovery of damages by a stockholder. This ruling we are disposed to approve. The referee further found that the several corporations were organized under the laws of Nebraska, and that they were duly authorized to sell and exchange their

shares of stock for the acquirement of property in the lakes and in the development of the business for which they were organized, without special license or permit or appraisal by any officer or tribunal of the state, and that the shares of stock so sold or exchanged, as well as shares purchased or subscribed for by the plaintiff and by his assignors, were each and all issued in good faith, for a sufficient consideration. This finding is also well supported by the record.

The consolidation or merger of the original corporations in the National Potash Corporation was not accomplished secretly, or by any fraud or misrepresentation. The situation which confronted the enterprise in which they were all engaged appears to have been generally well known and understood by all concerned, and each and all of the parties to this action, including plaintiff's assignors, holding stock in the original companies, consented to the merger, and voluntarily surrendered such stock, and accepted in lieu thereof an equivalent amount of stock in the new corporation, which took over all the assets in the old corporations and assumed all their liabilities. There is no proof of fraud in this transaction; and even if there had been irregularity in the original organizations, it would seem now too late for those who took part in or assented to the merger in the new corporation, and accepted the substitution of the new stock for the old, to set up any claim for damages on account thereof. When this settlement and merger were effected, the stock had a substantial value, representing valuable assets; but owing to unfavorable market conditions, the general stagnation of business, and the difficulty of procuring credits and funds for current needs (aggravated, possibly, by unwise management), it was found impossible to avoid the wreck, and bankruptcy ensued. The result was, of course, a serious loss to all concerned; but nothing is shown to charge the defendants with personal liability therefor.

We are aware that the foregoing is a very meager statement of the facts in the case, but we think it is sufficient in outline to indicate the nature of the controversy and the necessity of affirming the judgment below. The principal issue presented is one of fact, rather than law, and there is neither profit nor advantage to the parties in interest or to the profession in ex-

tending our opinion, to discuss the evidence. It is enough to say that an examination of the testimony satisfies us with the correctness of the findings of the referee and the judgment entered thereon.

Counsel for defendants have devoted considerable attention in argument to the proposition that the plaintiff's petition does not state a case for equitable consideration; but in view of our finding, already announced, upon the merits of the case, the question of pleading and practice becomes immaterial, and we do not undertake its consideration.

Since we find no reason for the reversal or modification of the decree appealed from, it is hereby—*Affirmed.*

STEVENS, C. J., PRESTON and DEGRAFF, JJ., concur.